**NEWSPAPER DRIVERS & HANDLERS' LOCAL NO. 372, etc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**Detroit Newspaper Publishers Association et al., Intervenors.**

**No. 18179.**

United States Court of Appeals Sixth Circuit.

Dec. 31, 1968.

◆

John S. Williamson, Jr., Milwaukee, Wis., for petitioner, David Leo Uelmen, Alan M. Levy, Goldberg, Previant & Uelmen, Milwaukee, Wis., on brief.

Lawrence M. Joseph, N. L. R. B., Washington, D. C., for respondent, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Lawrence M. Joseph, Richard Adelman, Attys., N. L. R. B., Washington, D. C., on brief.

Philip T. Van Zile, II, Detroit, Mich., for intervenors, Butzel, Eaman, Long, Gust & Kennedy, Detroit, Mich., on brief for Evening News Ass'n, Kenneth Murray, Detroit, Mich., on brief for Knight Newspapers, Inc., Daniel J. Tindall, Jr., Dickinson, Wright, McKean & Cudlip, Detroit, Mich., on brief for Detroit Newspaper Publishers.

Before WEICK, Chief Judge, McCREE and COFFIN *, Circuit Judges.

WEICK, Chief Judge.

This case is before us on the petition of Newspaper Drivers & Handlers' Lo-

* Honorable Frank M. Coffin, Judge, United States Court of Appeals for the First Circuit, sitting by designation.

cal No. 372, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Ind.) (Teamsters), to review an order of National Labor Relations Board issued on June 29, 1967 (166 NLRB No. 6). This is the second occasion on which the case has been before us for review.

On January 15, 1964 the Board issued a decision and order (145 NLRB 996) finding that The Evening News Association, owner and publisher of the Detroit News, violated Sections 8(a) (1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1) and (3), by locking out its employees from April 16 to April 19, 1962. While the case was pending before this Court, the Supreme Court rendered its decision in American Ship Bldg. Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). The Court held that a lockout of employees after an impasse in bargaining had been reached, for the sole purpose of bringing economic pressure to bear in support of an employer's bargaining position, is not a violation of Section 8(a) (1) or (3) of the Act. The Board then moved this Court to remand for reconsideration in the light of *American Ship*. We denied the motion to remand and denied enforcement of the Board's decision and order. Detroit Newspaper Publishers Ass'n v. NLRB, 346 F.2d 527 (6th Cir. 1965). The Supreme Court vacated the judgment of this Court and directed that the case be remanded to the Board for further consideration in light of *American Ship*. Newspaper Drivers and Handlers Local 372, Intern. Broth. of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, Inc. v. Detroit Newspaper Publishers Ass'n, 382 U.S. 374, 86 S.Ct. 543, 15 L.Ed.2d 423 (1966).

Upon remand, the Board reconsidered the case upon the original record and found that the Detroit News (News) did not violate Sections 8(a) (1) and (3) of the Act by locking out its employees. The facts are stated in our first opinion and need not be repeated here except for emphasis.

■ Teamsters contends that the Board did not find that an impasse in bargaining had been reached, and hence the lockout was unlawful. This is incorrect. In its Supplemental Decision and Order the Board did make a specific finding that "both parties viewed their negotiations as being *deadlocked* on key issues, and that neither doubted that a work stoppage would be required to break the *deadlock*." (Italics ours). The words "deadlock" and "impasse" are synonymous.

In Webster's New World Dictionary of the American Language, impasse is defined as "a situation from which there is no escape; difficulty without solution; deadlock."

The words were used interchangeably by the Court in Dallas Gen. Drivers Local 745 v. NLRB, 122 U.S.App.D.C. 417, 355 F.2d 842, 845 (1966).

■ The finding of the Board that an impasse or deadlock existed is supported by substantial evidence. Teamster president Hoffa stated prior to the meeting with the News on April 14th:

"The News had better be present * * * because the issues at the News would have to be settled or they'd be on strike also."

After the meeting, Hoffa told News negotiator Dorris that he considered the News' offer to be its "last proposal" and its "final best offer." No further meetings were held between the News and the Teamsters after April 14th until a third party, Detroit Police Commissioner Edwards, now a judge of this court, was called in to mediate the dispute.

Thus, over identical issues, Teamsters had struck the Free Press and threatened the News with a strike unless it acceded to the union's demands. The parties were unable to resolve their disputes and had to call upon an experienced mediator for assistance. This is the clearest kind of evidence of an impasse. In our

opinion, the lockout was within the holding of *American Ship*.

We should point out, however, that the Board held in Darling & Co., 171 NLRB No. 95 (1968), that a pre-impasse lockout, under the circumstances of that case, was not violative of Sections 8(a) (1) and (3) of the Act. We do not understand that the Supreme Court in *American Ship* foreclosed consideration of factors other than impasse in determining the legality of a lockout.

The premise underlying the Teamsters' remaining argument is that, in locking out is employees, the News was not pursuing its own economic interests, but was primarily seeking to support the bargaining position of the Free Press. Teamsters argues that because this purpose is too remote to constitute a legitimate bargaining position, the lockout is unlawful under the reasoning of *American Ship*. This attempt to characterize the News' economic interests as "remote" is based upon Teamsters' stress on the literal absence of a formal multi-employer unit.[1]

Teamsters contends that in the absence of such a unit, an employer cannot be said to have any legitimate interest in supporting, by a lockout, another employer's bargaining position. These arguments attack the motivation of the News in locking out its employees. Whatever may be said of the validity of this contention in other circumstances, it is clear that it has no meaningful relationship to the industrial realities involved here, and is unsupported by the facts of this case.

Obviously, the News' lockout had the effect of supporting the bargaining position of the Free Press. The facts of this case, however, make it clear that the News' utilization of economic pressure was not motivated by a concern for the bargaining position of its competitor, the Free Press, but by its own direct and immediate economic interest in the outcome of the negotiations. The News, as well as the Free Press, had been negotiating with the Teamsters for an extended period of time and was faced with the same bargaining demands by the Union. The Teamsters struck the Free Press over some issues which the News considered vital to it.

By locking out its employees, the News sought to advance its own immediate bargaining position by supporting the struck employer in its attempt to withstand the union's demands on the vital issues. Clearly, concessions granted by the struck employer could be expected to have an adverse effect on the News' ability to adhere to its own position. ·Thus, while an effect of the lockout was to aid the Free Press, the interest of the News in using economic pressure was grounded upon a very real, direct, and immediate bargaining motivation to advance its own cause. As aptly stated in *American Ship*:

> "There was not the slightest evidence and there was no finding that the employer was actuated by a desire to discourage membership in the union as distinguished from a desire to affect the outcome of the particular negotiations in which it was involved." American Ship Bldg. Co. v. NLRB, supra, 380 U.S. at 313 [2], 85 S.Ct. at 964.

---

1. In the initial proceeding before the Board, the News attempted to defend on the ground that this case was governed by NLRB v. Truck Drivers' Local Union No. 449, International Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Buffalo Linen), 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957). This defense was rejected by the Board.

2. This discussion is also relevant to the Teamsters' apparent argument, not discussed by the Board and we assume not raised below, that the lockout violated Sections 8(a) (5) and (1) of the Act because it was in support of a secret agreement to alter the established bargaining structure and was violative of the statutory requirement to bargain in good faith.

Teamsters argues that the loss in wages caused by the lockout had a deterring effect on the employees' desire to remain as members of the union. It must be assumed that in authorizing a strike or in making demands to which the employer is not willing to accede, the employees considered the risk involved and were willing to take it. If the lockout is lawful, the loss of wages resulting therefrom[3], as well as from a strike, must be borne by the employees or by the union. To hold otherwise would be inconsistent with the holding of the Supreme Court in *American Ship.*

Teamsters' reliance on David Friedland Painting Co., 158 NLRB 571 (1966), enforced, 377 F.2d 983 (3d Cir. 1967), is misplaced. There the economic interest of the employer in the conditions of employment in the other bargaining units was much more remote than the News' interest here. In *Friedland* the employer had a collective bargaining agreement with Painters' Local 1221 which provided that when he worked within the geographic jurisdiction of Painters' Local 144 he would pay the wage scale which Local 144 had in its contract with a multi-employer group in its own area. When Local 144 struck its employer group during their negotiations, Friedland supported those employers by locking out nine of his employees who were members of Local 144. The Court of Appeals stated:

" * * * [T]he Elizabeth Association was not involved in any bargaining negotiations with Local 144, the strike was not against that association or Friedland; nor were any demands being made upon them by Local 144. Clearly, Friedland had no legitimate bargaining position to protect." Id. at 988.

The Board warned in *Friedland*:

"To allow this collateral or indirect interest in a labor dispute to be deemed a legitimate business interest, sufficient to serve as justification for a lockout of respondent's own employees is to arrive at a far reaching result never intended by the Supreme Court in *American Ship Building*." David Friedland Painting Co., 158 NLRB supra at 578.

We need not, and do not, question the result and the reasoning of the Court in *Friedland*, for our case is different in several critical aspects. The News was negotiating with the same local and over many of the same issues as was the Free Press. The Free Press had been struck and there was a very real possibility that the News would also be struck. The News' lockout was designed to aid the News' own bargaining position, which could not be said, without great attenuation, for the lockout by the employer in *Friedland*.

This lockout was not "inherently so prejudicial to union interests and so devoid of significant economic justification" that it could be found to be unlawful without specific evidence of anti-

---

As already noted, the purpose of the lockout was to advance the News' own bargaining position and this was also the purpose of the News' agreement with the Free Press since that agreement concerned only the three issues that the News considered vital to its position. There was no attempt here to obtain the benefits of a multi-employer bargaining unit since the agreement concerned only a few of several issues and since neither employer agreed to be bound by the negotiations of the other.

Thus, the News was acting independently for its own benefit and was not attempting to establish a multi-employer bargaining unit.

Nor was there any showing of antiunion animus or bad faith in the sense of a refusal to negotiate with the union over any of the issues involved, nor was such a refusal alleged. See Kroger Co. v. NLRB, 401 F.2d 682 (6th Cir. Oct. 10, 1968).

3. In the case at bar, five days' wages.

union animus. This situation is not similar to a case where "many have broken a shop rule, but only union leaders have been discharged,"[4] since this lockout was not inherently discriminatory.

Further, since the News had been negotiating for an extended period of time and was threatened with strike action, it cannot be said that the lockout lacked "significant economic justification" insofar as the News was concerned.

Finally, Teamsters contends that the newspapers conspired to violate the antitrust laws by seeking identical economic settlements in an unlawful effort to restrain trade by eliminating labor costs as a competitive factor in their industry.

There are two answers to this contention. First, the issue is not properly before the Court under the order of remand issued by the Supreme Court, which was for the sole purpose of consideration in the light of *American Ship*, (wherein no such issue was involved.) The Supreme Court did not adopt the suggestion of the Board that the case also be remanded for consideration in the light of United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1968).

■■ Second, it was Teamsters, and not the newspapers, which presented a number of identical demands. The union, in pursuance of its own interest, may seek to obtain the same terms from other employers. Id. at 665, 85 S.Ct. 1585. The News was not interested in all of the demands made by Teamsters upon the Free Press; only three were vital to it. As noted above, the News was acting in its own legitimate bargaining interest. The actions of these newspapers were pursuant to their individual interests in regulating their own labor relations, and no more. In the circumstances of this case, we see nothing unlawful in the newspapers' collaboration in their own defense.

The petition for review is denied.

4. This is the example used by the Supreme Court to illustrate this test. American Ship Bldg. Co. v. NLRB, 380

U.S. 300 at 312, 85 S.Ct. 955 at 964, 13 L.Ed.2d 855.